**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
JOYCE P. BROWER-McLEAN, et als          :
                                        :               Civil Action No. 05-5150 (PGS)
                    Plaintiffs,         :
                                        :
            v.                          :                        **OPINION**
                                        :
CITY OF JERSEY CITY, et als,            :
                                        :
                    Defendants.         :
_____:

SHERIDAN, U.S.D.J.

     This matter arises out of the entry into McLean's home by a team of police officers in order

to arrest Terrance Culbreath, a fugitive for whom an arrest warrant had issued but who did not live

there.

     Presently there are numerous motions for summary judgment by law enforcement defendants

to a complaint that alleges seven causes of action.  The Complaint contains seven counts. Count One

is a catchall.  That is, it alleges that Plaintiffs' right "to be free of unreasonable searches and seizures

and their right to liberty," as guaranteed by the First, Fourth, Fifth, Eighth, and Fourteenth

Amendments, was violated pursuant to 42 U.S.C. § 1983. The remaining counts are more specific.

Count Two alleges a cause of action under the Fourth Amendment (unlawful search and seizure);

Count Three alleges Defendants failed a failure to intervene on behalf of Plaintiffs' knowing that

such rights were being violated contrary to 42 USC §1983; Count Four alleges a deprivation of

substantive due process in violation of 42 USC §1983; Count Five alleges the Hudson County

Prosecutor's Office (HCPO), Hudson County Sheriff's Office, and the Jersey City Police Department are liable under 42 U.S.C. § 1983 (Monell claim); Count Six alleges negligence under the N.J. Tort Claims Act (Stat. Ann. 59:1); and Count Seven alleges liability under the N.J. Constitution against all Defendants.

I.

All of the Plaintiffs reside at 96 Wegman Parkway, Jersey City, New Jersey (the "McLean Residence"). More specifically, the Plaintiffs are Joyce Brower-McLean and her children, Sable McLean, Tina Carr, Henry Monroe, and Neal Monroe. In addition, Tina Carr's family lived in the McLean Residence. They are Darnell Carr (husband), Darrell Carr, Jr., and Tiana Carr (her children). Similarly, Henry Monroe's son, Jordan Monroe, and his financee, Dorcas Caesar, resided there. The McLean Residence was entered by police officers from several different law enforcement entities in the predawn hours of October 29, 2004. All of these individuals were present and witnessed the officers searching the McLean Residence with their weapons drawn except for Neal Monroe who was at work.

The Defendants fall into several categories. First, there are the officers involved in the entry of the McLean Residence. They are:

1.  Detective Edward Rossiter of the HCPO[1].

2.  Detective Vulcano of the Kearny Police Department;

3.  Officer Tony Musante of the Jersey City Police;

---

[1]   For the five years prior to the incident, Rossiter had been assigned to a Fugitive Task Force overseen by the U.S. Marshals Office. On the day in question, it is unclear from the record whether Rossiter was present in his capacity as a Fugitive Task Force member under the supervision of the U.S. Marshal or his employer, HCPO.

Case 2:05-cv-05150-PGS-ES   Document 80   Filed 10/06/08   Page 3 of 17 PageID: 1139

4.      Officer Leon Tucker of the Jersey City Police;

5.      Officer Ryan Muller of the HCPO; and

6.       Det. John Lazzara of the Passaic County Sheriff's Office.[2].

In addition to the above individuals, there are two other individuals named.  Detective Keith Stith of the HCPO assigned the officers to the team which searched the  McLean Residence, but he did not participate in the search. And finally, Adel Mikhaeil, a bounty hunter, who was also present at the McLean Residence at the time of the search at the request of Det. Rossiter.

The last category of Defendants are the governmental entities. They are the HCPO, which was primarily responsible for assembling teams of law enforcement officers to execute outstanding warrants against gang members ("gang round-up").  In addition, the Hudson County Sheriffs Office and the Jersey City Police Department are sued, but it is unclear why..

For the three weeks prior to the October 29 search, Det. Rossiter was attempting to locate Terrance Culbreath, a fugitive for whom an arrest warrant had issued, and who was listed on the County's "most wanted" list.   Rossiter was performing this work as a member of the Fugitive Task Force under the supervision of the US Marshal's Office. In order to acquire information about Culbreath's whereabouts, Rossiter contacted a bounty hunter, Adel Mikhaeil, who was also searching for Culbreath.  Mikhaeil reported to Rossiter that he had seen Culbreath several times. Mikhaeil first observed him on October 9, 2004 driving a red Volkswagen Passat in Jersey City. On October 11, 2004, Mikhaeil spotted the Passat in front of the McLean Residence, but there is no evidence that he saw Culbreath at that time.  Several days later (October 15) Mikhaeil caught a

---

[2]      Lazzara, similar to Rossiter, was a member of the Fugitive Task Force. Lazzara claims he was under the supervision of the HCPO that evening.  The HCPO denies this claim, and contends that he was acting in his capacity as a member of the Fugitive Task Force.

glimpse of Culbreath driving the Passat on Garfield Avenue in Jersey City,  and later that day, he again observed the Passat in front of the McLean Residence, but like the previous time, he did not see Culbreath enter or exit the McLean Residence.

As a result of this activity, Mikhaeil traced the Passat's license plate through Motor Vehicles.  The trace revealed that the Passat was owned by Tonya Jackson, Culbreath's spouse. Based upon the information, Rossiter visited Tonya Jackson's home.  At that time,  Rossiter was advised that Terrence Culbreath no longer resided there.

On October 28, 2004, Mikhaeil notified Rossiter that he had arrested another fugitive, Gregory Phillip, who allegedly knew of Culbreath's location.  Philip stated that Culbreath spent every night "sitting on the front stoop of 96 Wegman Parkway (the McLean Residence) drinking beer with another resident of the house named Boo-Boo." He also told Mikhaeil that Culbreath lived in the basement of the McLean Residence.  Immediately thereafter, Rossiter spoke directly with Philip by telephone.  Rossiter questioned Philip for fifteen minutes in order to corroborate the information he had shared with Mikhaeil.

At this point, Rossiter did not undertake any further investigation such as surveilling the McLean Residence in order to confirm Culbreath's presence. Evidently, he was satisfied with Philip's statements. The arrest warrant on Culbreath had two possible addresses for Culbreath, neither of which was the McLean Residence.  Despite this, Rossiter did not attempt to secure a search warrant or amend the arrest warrant to include the McLean Residence.

The very next morning after Philip's statement, the HCPO scheduled a gang round-up.  A gang round-up is a multi-agency law enforcement task force to effectuate outstanding arrest warrants against gang members simultaneously.  In order to safely stage this gang round-up, a large number

4

of police officers assembled. As a result, cooperating law enforcement agencies "loan" an officer(s) for the day to the HCPO in order to secure the arrests.  The task force members were assigned to teams by Stith.  Each team had a team leader.

In the wee hours of October 29, 2004, Rossiter appeared at HCPO headquarters[3] and requested Stith to assign some police officers to assist him in the arrest of Culbreath.  Stith, knowing Rossiter was a member of the Fugitive Task Force and of the notion that "officer safety is first," complied by assigning officers Vulcano, Musante, Tucker, and Muller. As noted above, Lazzara was also part of the team, but at whose direction he participated is unclear.  Rossiter was the team leader. He conducted a pre-raid meeting in order to plan the entry of the McLean Residence.  As Detective Vulcano testified, Rossiter "was the commanding officer and led both the planning and the entry into the home."

At approximately 4:00 a.m. on October 29, 2004, Rossiter and his team arrived at the McLean Residence.  Mikhaeil the bounty hunter was also present. The officers wore plain clothes with raid jackets bearing the word "police" on their backs.  Rossiter and Lazzara went to the front door while the others covered the side entrance.[4]  The officers knocked on the door. No one answered and after several minutes, Rossiter and Lazzara opened the unlocked front door and entered.

---

[3]     It is unknown whether Rossiter was acting on behalf of the Fugitive Task Force or as part of the HCPO gang round-up.  *Supra* footnote 1.

[4]     The front door had several door bells. An officer investigating the search of the McLean Residence noted in his report that this would have indicated that more than one dwelling unit existed within the Residence and clearly alerted Rossiter not to proceed without more specifics.

Plaintiffs were abruptly awakened by the entry of the police. Sergeant Rossiter and several other officers proceeded to the bedroom of Tina and Darnell Carr, turned on the light, and ordered them to put their hands up. The Carrs were asked if Culbreath was on the premises. The Carrs recognized a picture of Culbreath but referred to him by a different name. Culbreath was not there. According to Rossiter, Plaintiffs were not required to get out of bed at gunpoint. The Plaintiffs were not touched by any of the officers. The only property damage was to an attic bedroom door which was kicked in. In the aftermath of the incident, Rossiter was disciplined by HCPO.

Plaintiffs retained William F. Kraus, a former police chief, of Law Enforcement Resources, Inc.,as an expert witness to evaluate the propriety of the search. Kraus extensively reviewed all the depositions and reports. He concluded that the "law enforcement officers did violate the Civil Rights of each of the Plaintiffs as guaranteed by the Fourth Amendment of the U.S. Constitution and the New Jersey Constitution (Art. 1, Para. 1)". Interestingly, the expert expressed no opinion about the liability of the governmental entities.

II.

Since several of the Defendants move for summary judgment on various grounds, the Court will first address each major issue separately.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a

6

district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"   *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").  Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement.  *Anderson*, 477 U.S. at 247-48.  If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate."  *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

### III.

The Plaintiffs agreed that Count Six of the Complaint should be dismissed but only as to some of the Defendants.  This Count sets forth a claim under the New Jersey Tort Claims Act (N.J.Stat. Ann. 59:1).  With regard to this claim, Plaintiffs acknowledge that they

have failed to assert sustained injuries in excess of the $3,600 which is required under the New Jersey Tort Claims Act in Count Six of the Complaint in order to impose liability on a public entity or public official. Plaintiffs concede that with respect to these Defendants, their motions to dismiss Count Six of the Complaint should be granted. Plaintiffs maintain that Count Six of the Complaint should stand with respect to all other Defendants who did not move to dismiss the ground.

It is uncontroverted that none of the Plaintiffs meet this threshold amount (Id. 59:9-2(d)). Although Plaintiffs seek to limit the dismissal to those Defendants who have moved for summary judgment, this does not make sense because the rationale applies equally to all governmental Defendants and officials. As such, the Court dismisses Count Six as to all Defendants and officials.

The only remaining Defendant in this Count is Mikhaeil, the bounty hunter. Under the Tort Claims Act, a public employee means an "employee of a public entity," and an employee includes an "officer, employee, servant, whether or not compensated or part-time, who is authorized to perform any act or service; provided, however that the term does not include independent contractor". *Id.* The distinction between employees and independent contractors is based primarily on the employer's control. The greater the degree of control exercised by an employer, the more likely the individual in question is an employee. *Lowe v. Zarghami*, 731 A. 2d 14, 19 (N.J. 1999). There is a four-part test New Jersey Courts use to determine the degree of control: "(1) the degree of control exercised by the employer over the means of completing the work; (2) the source of the worker's compensation; (3) the source of the worker's equipment and resources; and (4) the employer's termination rights." *Id.* at 19-20.

In evaluating these facts, it is clear that Mikhaeil is not a public employee.  Plaintiffs do not allege that any of the public entities have supervision and control over Mikhaeil[5].  Since Mikhaeil is not a public employee, he does into fall within the New Jersey Tort Claims Act. As such, this Count is dismissed against Mr. Mikhaeil.

IV.

Count Four of  Plaintiffs' complaint alleges a deprivation of substantive due process as protected by the Fourteenth Amendment.  More specifically, Plaintiffs claim that Defendants' conduct "was an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourth Amendment." Generally, substantiative due process claims are disfavored where the conduct at issue is addressed elsewhere in the Constitution.  *See, Graham v. Connor*, 490 U.S. 386 (1989).  In 1994, the Supreme Court stated that "where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Together, *Albright* and *Graham* stand for the proposition that "if a constitutional claim is covered by a specific constitutional provision, the claim must be analyzed under the standard appropriate provision to that provision, not under the rubric of substantive due process." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). It has been stated  that the protections afforded by the substantive component of the Due Process Clause have generally been limited to "matters relating to marriage,

---

[5]         Courts also use a relative nature of the work test, which examines the economic dependence of the worker on the business he or she serves and the relationship of the work to the operation of the business.  *Id.* at 20-21.  This Court finds that under this test as well Mikhaeil is an independent contractor.

family, procreation, and the right to bodily integrity."  Noting that "the guideposts for responsible decision making in this [uncharted] area [of substantive due process] are scarce and open-ended." the Supreme Court has in recent years expressed a reluctance to expand the scope of substantive due process protection.  Whenever "an explicit textual source of constitutional protection" addresses particular governmental behavior, courts must rely on the more explicit source of protection to analyze the claim, rather than the amorphous and open-ended concept of substantive due process. *Schwartz and Urbonya*, Section 1983 Litigation 2d at p. 36-37 (Federal Judicial Center 2008).

In this case, Plaintiffs clearly set forth a cause of action for violation of their Fourth Amendment protection against illegal search and seizure.  It is appropriate to proceed on that claim rather than wandering into the murky waters of "abuse of executive power" which shock the conscience.  *See generally*, *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992).

The substantive due process claim as set forth in Count One and Four is dismissed as to all Defendants.

## V.

The primary issue in the numerous motions is whether the defense of qualified immunity bars this law suit against the individual defendants.  Qualified immunity balances two competing policies.  That is, the right to redress and vindicate constitutional wrongdoing must be balanced against "inhibiting officials in the discharge of their duties. " Accordingly, qualified immunity will ban a law suit based on a violation of a constitutional right so long as the officials' actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987).  The Supreme Court has held that in order to determine whether the doctrine of qualified immunity bars a claim for violation of a civil right, the trial court

must apply a two part objective test. *Harlow v. Fitzgerald*, 427 U.S. 800 (1982). The Supreme Court

framed the test as:

> Government officials performing discretionary functions, generally
> are shielded from liability for civil damages insofar as their conduct
> does not violate clearly established statutory or constitutional rights
> of which a reasonable person would have known. *Burns v. County of
> Cambria*, 971 F.2d 1015, 1021 (3d Cir. 1992).

The defense of qualified immunity applies "even to Fourth Amendment challenges to arrests

and searches where the Constitutional standard itself is objective reasonableness. *Schwartz and

Urbonya* at 146-47. The case at hand is analogous to *Anderson*, 483 US at 635.   In *Anderson*, state

and federal officers conducted a warrantless search of Plaintiff's home in search of a suspect in a

bank robbery. The suspect was not there. At the trial level, the district court dismissed on the basis

that the officers showed sufficient proof of probable cause and exigent circumstances to justify the

warrantless search. The Circuit Court reversed due to the existence of fact questions which the

Circuit Court believed were for the jury to decide.  On appeal to the Supreme Court, Justice Scalia

writing for the majority, noted the issue is whether the contours of the right were "sufficiently clear

that a reasonable official would understand what he is doing violates that right". *Id.* at 640.  In

*Anderson*, the Supreme Court held that qualified immunity applied, and re-instated the district

court's dismissal.   The Third Circuit states the qualified immunity test similarly:

> A right is "clearly established" for qualified immunity purposes only
> if the contours of the right are sufficiently clear that a reasonable
> official would understand that what he is doing violates that right.
> Thus, defendants are entitled to qualified immunity if reasonable
> officials in their position at the relevant time could have believed, in
> light of what was in the decided case law, that their conduct would be
> lawful. Even where officials clearly should have been aware of the
> governing legal principles, they are nevertheless entitled to immunity

> if based on the information available to them they could have
> believed their conduct could be consistent with those principles.
> *Larsen v. Senate of the Commonwealth of Pennsylvania, et al.*, 154
> F. 3d 82, 87 (1998)

Here, Detectives Vulcano, Muller and Lazzara basically argue that Plaintiffs' claims fail due to defense of qualified immunity as measured against the above standard. More specifically, they were acting pursuant to the orders of team leader Rossiter, and they reasonably believed Rossiter had all the necessary warrants and/or authorizations to carry out the search. Under the circumstances, this is objectively reasonable conduct. It is undisputed that Rossiter conducted the pre-arrest meeting and developed the plan of execution. As such, it was reasonable for those officers to conclude that the decisions by Rossiter about the propriety of conducting the search were satisfied.

Detective Stith similarly argues that he is cloaked with qualified immunity from suit. On that day, Stith's role was to assign officers to the teams and make certain Rossiter, as well as other team leaders, had sufficient manpower to effectuate the arrest of fugitives. Stith knew Rossiter was a seasoned police officer with five years experience on the Fugitive Task Force. There is nothing in the record that indicates that it was Stith's duty to check and determine the sufficiency of each arrest and/or search warrant. His duty was to assign personnel. It is objectively reasonable that he believed that a veteran officer like Rossiter had the necessary warrants.

Rossiter, on the other hand, can not be shielded by the defense of qualified immunity. There are numerous reasons for this finding. First, Rossiter was the team leader. He was in command of the operation, and the person most familiar with the facts. He had a duty to make certain the arrest warrant was sufficient. Second, there were no exigent circumstances justifying the search because Rossiter could have applied for a search warrant in the interim period between the discussion with Philip and the search. Moreover, Mikhaeil first allegedly saw the Passat in front of the McLean

Residence on October 11, 2008 – 18 days prior to the search.  There is no evidence that Rossiter took any action to confirm the statements of Mikhaeil during the lengthy time period. Third, the arrest warrant contained different addresses for Culbreath giving rise to a reasonable doubt as to its validity with regard to entry into the McLean Residence without securing an amendment to the arrest warrant.  Fourth, the McLean Residence had several doorbells giving rise to reasonable probability that there were more than one dwelling unit within the McLean Residence. As a result, Rossiter should have exercised greater caution and restraint prior to entering the McLean Residence in order to avoid violating the rights of others. Fifth, the statements of Philip should have been corroborated through surveillance or some other technique since Philips' credibility could not be confirmed. Sixth, Rossiter knew the McLean Residence was not owned by Culbreath, and that Plaintiffs were residing there. A reasonable police officer would have taken additional steps to ensure the rights of the McLean were not unreasonably infringed upon when arresting Culbreath. In sharp contrast, Rossiter did nothing.

Rossiter argues that "an arrest warrant founded in probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); *U.S. v. Agnew*, 407 F. 3d 193, 196 (3d Cir. 2005).  While this proposition is correct, Rossiter failed to meet the test.  For the reasons aforementioned, it was not reasonable to believe the "suspect [was] within" the McLean Residence.  Accordingly, under these facts, a reasonable officer would have known the arrest warrant was not sufficient, and the search of the McLean Residence was not objectively reasonable under the circumstances.

VI.

Rossiter also seeks dismissal of Plaintiffs' claim for punitive damages.  In order for a jury to award punitive damages, there must be willful or reckless conduct in gross disregard of the rights of the complaining party.  *Savause v. Agress*, 883 F. 3d 1194, 1204  (3d Cir. 1989). The mere existence of a civil rights violation is not a guarantee of eligibility for punitive damages.  *Kolstad v. American Dental Association*, 527 U.S. 526 (1999). The Court recognizes that on a motion for summary judgment, the Court must give all inference to the non-moving party.  In this case, for all the reasons stated in the above section,  there is sufficient evidence for a jury to find Rossiter acted recklessly.

VII.

Several Defendants claim that Neal Monroe lacks standing to sue because none of his rights were violated. That is,  Neal Monroe was not at the home during the search, and since the house was owned by this mother; he had no expectation that any of his rights were violated.  *See Eiland v. Jackson*, 34 Fed. Appx. 40 (3d Cir. 2002).

*Eiland*  held that the plaintiff lacked standing to assert a violation of his Fourth Amendment rights for a search conducted of his daughter's home where he lived when he was not present during the search.  That case involved the entry of plaintiff's dwelling based upon a search warrant, the validity of which was never challenged by plaintiff.  In making the determination, the Third Circuit noted that the plaintiff, as a resident, had a reasonable expectation of privacy in his daughter's home, but failed to allege an injury in fact to any privacy right he enjoyed, because he alleged a violation of the knock and announce rule, and even assuming such a violation existed, it would have made no difference as plaintiff was not at home to hear the police announce themselves.  *Id.* at 42.  The court reasoned, as a result, that the plaintiff could not establish that his privacy interests had been impinged

14

upon since he was not home at the time of the forced entry.  *Id.* The Third Circuit further concluded that the plaintiff had no possessory interests in the three doors allegedly damaged during the search, as the house and the damaged doors belonged to the plaintiff's daughter.  Therefore, the plaintiff had no standing to assert a claim of property rights under the Fourth Amendment.

The Court finds *Eiland* distinguishable.  Here, Neal Monroe's room was locked which is why the police broke the door down.  In addition, there were several doorbells (giving all inferences to plaintiffs) one of which may have been to his room in the attic. The locked door plus the doorbell establishes some level of expectation of privacy separate from the members of the household.  In addition, a plaintiff may sustain a cause of action for a Fourth Amendment privacy right violation even when plaintiff is not at home at the time of the search.  *See Michigan v. Clifford*, 464 U.S. 287, 295 (1984) ("[Plaintiffs'] Fourth Amendment claim is instead for unlawful entry of their home, and this is a claim they may assert because they have a privacy interest in their home, whether or not they were present at the time of the entry.").  Although this claim stands on a slender reed, there is a jury question as to whether his rights were violated.

## VIII.

Defendant Adel Mikhaeil, the bounty hunter, argues that 1983 liability does not attach to him. In order to prove a §1983 claim, Plaintiff must establish four elements (1) conduct by a person (2) under the color of state law (3) proximately causing (4) a deprivation of a federally protected right. *Schwartz v. Urbonya*, supra at 6.  More specifically, Mikhaeil argues he was not acting under the color of state law.  Where a  bondsman is acting solely on their own behalf in effectuating an arrest without the assistance of law enforcement, he is not considered to be acting under the color of state law.  *Landry v. A-Able Bonding, Inc.*, 75 F. 3d 200 (5th Cir. 1996); *Ouzts v. Maryland Casualty*, 505 F. 2d 547, 550.  The *Landry* case is instructive.

In *Landry*, several bondsmen traveled from Louisiana to Texas and arrested Landry for failure to appear on a court date before a Louisiana tribunal.  Plaintiff argued that the bondsmen acted under the color of state law because the bondsmen arrested plaintiff pursuant to an arrest warrant issued by a Louisiana court and pursuant to a statute of Louisiana which authorized bondsmen to arrest fugitives.  The Court held that such conduct could not be fairly attributable to the state. *See Jackson v. Metropolitan Edison*, 419 U.S. 345 (1974).  Generally, actions of bondsmen are only considered to be "under the color of state law" when the bondsmen enlist the assistance of law enforcement officers in arresting their principals." *Landry*, 75 F. 3d. at 204.  In this case, Mikhaeil enlisted the aid of Rossiter by providing information about the alleged location of Culbreath, and attending the search of the McLean residence.  As such, he acted under the color of state law[6].

The issue which arises is whether Mikhaeil is entitled to qualified immunity and is thus not subject to liability under Section 1983.  The Supreme Court has held that certain private individuals acting under the color of state law are not entitled to qualified immunity. *Richardson v. McKnight*, 521 U.S. 399, 404 (1997).  In *Richardson*, 521 U.S. at 413, the Court declined to extend immunity to prison guards who were employees of a private, not-for-profit prison management firm.  The decision was very narrowly drawn to apply only to the facts at issue. *See also Wyatt v. Cole*, 504 U.S. 158, 164 (1992). Since the parties have not addressed the issue of whether a bounty hunter may be entitled to assert qualified immunity under these circumstances the Court will not address same[7].

---

[6]      The Court makes no finding regarding the causal relationship between Mikhaeil's actions and the constitutional violations alleged since neither party argued same.

[7]      If Mikhaeil wishes to assert the defense, he may do so by letter brief which must be filed on or before October 20, 2008.  Any response is due October 30, 2008.

16

*See Atkins v. United States*, 679 A. 2d 1017 (1996); *Calloway v. Glassboro Police*, 89 F. Supp. 2d 543 (D.N.J. 2000).

IX.

Count Three of the Complaint appears to allege that all Defendants had an affirmative "duty to intervene" on behalf of Plaintiffs to make certain their civil rights were not violated. *See DeShaney v. Winnebago County*, 489 U.S. 189 (1989). Although it is not clearly explained, Plaintiffs seemingly allege that the police officers had a duty to check whether Rossiter was correct with regard to his determination as to the appropriateness of the entry into the McLean Residence, and to take affirmative steps to prevent any illegal search.  The Plaintiffs' theory fails two reasons. First, the Court has dismissed the claims against the individual officers, but for Rossiter, based upon qualified immunity. It would also act as a bar to this claim. Secondly, since this duty to intervene is not clearly pled, the Court surmises that it  must be some sort of substantive due process violation. To succeed on such a theory, Plaintiff must show that the officers deliberately disregarded Plaintiffs' right or their conduct "shocks the conscious."  *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  No reasonable jury could find such conduct existed based on the facts of the case. Count Three is dismissed.

An appropriate Order will issue.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

October 3, 2008

17